EBOIGBE, Appellee and Cross–Appellant,

v.

ZOOLOGICAL SOCIETY OF CINCINNATI, d.b.a. Cincinnati Zoo and Botanical Gardens, Appellant and Cross–Appellee.

[Cite as *Eboigbe v. Zoological Soc. of Cincinnati* (1994), 96 Ohio App.3d 102.]

Court of Appeals of Ohio,
Hamilton County.

Nos. C–930021 and C–930043.

Decided July 6, 1994.

*Brown, Cummins & Brown Co., L.P.A., Robert S. Brown* and *Kathryn Knue Przynara,* for appellee and cross-appellant.

*Lindhorst & Dreidame* and *Michael F. Lyon,* for appellant and cross-appellee.

*Per Curiam.*

This is an appeal and cross-appeal from an action brought by Felix Eboigbe to recover for damage to his wood sculpture *Fulani Mother and Child,*[1] while it was in the custody of the Cincinnati Zoo in preparation for its "Month in Africa".

---

1. For a view of the work and its artist, see Appendix A.

exhibit.[2] The trial court granted partial summary judgment in favor of Eboigbe, finding that the Zoo was an "art dealer" under R.C. 1339.71(A), the definitional part of the statutory section relating to consignment of art works to dealers, R.C. 1339.71 through 1339.78, which makes art dealers strictly liable for loss or damage to artwork taken on consignment. Following a bench trial, the trial court determined that the value of the damaged sculpture, minus the consignment fee, was $78,000 and awarded judgment in that amount plus attorney fees and expenses in the amount of $52,000.

The Zoo appeals from that judgment, asserting two assignments of error: (1) that the trial court erred by failing to grant its Civ.R. 41(B)(2) motion after Eboigbe rested his case, and (2) that the trial court erred by granting Eboigbe's motion for summary judgment on the issue of whether it was an "art dealer" pursuant to R.C. 1339.71.

In his cross-appeal, Eboigbe asserts three assignments of error: (1) that the trial court erred to his prejudice by ruling that the consignment agreement did not establish a value of $350,000 for the damaged art pursuant to R.C. 1339.72; (2) that the trial court erred to his prejudice by failing to find on his separate contract claim that the Zoo was required under the consignment agreement to insure the sculpture for $350,000; and (3) that the trial court erred to his prejudice by reducing his actual damages by the twenty-five-percent commission payable on the sale of the sculpture.

For the reasons that follow, we overrule the Zoo's first assignment of error but find merit in the second, and thus reverse the trial court's grant of summary judgment on the issue of whether the Zoo is an "art dealer" under R.C. 1339.71(A). Given our disposition of the Zoo's second assignment of error, requiring a remand to the trial court for further proceedings on the issue of the Zoo's status as an "art dealer," we find it unnecessary to reach Eboigbe's first and third assignments of error in his cross-appeal. With respect to Eboigbe's second assignment of error in his cross-appeal, the existence of material factual issues on the contract claim, a claim that was left entirely unaddressed by the trial court, prevents us now from validating Eboigbe's contention that he was entitled to judgment on that claim.

I

Felix Eboigbe, a Nigerian-born artist-in-residence at the University of Cincinnati, was invited by the Cincinnati Zoo in the summer of 1989 to display and sell his wood sculptures as part of its "Month in Africa" exhibit. Before the exhibit

---

2. For a view of the work as damaged, see Appendix B.

began, on July 13, 1989, Zoo personnel came to the University of Cincinnati, where he stored his works, and with a truck hauled several of his sculptures to the bird house at the Zoo.

What followed then was disputed at trial. Eboigbe claimed that he also went to the Zoo on July 13, carrying with him two documents: (1) a "Consignment Agreement," which he regularly required all consignees of his artwork to sign, and (2) a price list for each of the works. According to Eboigbe, he handed both documents to Jennifer Herron, the Zoo's manager of special events, at the same time.

The Zoo, while not disputing that Eboigbe presented the consignment agreement on July 13, or that it obtained the price list on the same day, does dispute that Eboigbe presented the price list in conjunction with the consignment agreement. In a deposition admitted as evidence at trial, Herron testified that, although she appeared to have obtained possession of the price list on July 13, Eboigbe did not present the two documents together. In fact, Herron could not remember from whom she received the price list or under what circumstances. In her deposition, Herron testified:

"A. No, I know for a fact there was not a price list handed to me when I signed the consignment sheet.

"Q. When you say that, do you mean not at the exact moment?

"A. Or within the same structure of event time, 15 minutes upon that meeting with Felix when I signed the consignment sheet, he did not hand me a price list.

"Q. But it was apparently handed to you the same day; is that correct?

"A. Apparently, yes.

"Q. And that price is, in fact, the price list called for by the contract?

"MR. LYON: Objection. * * *

" * * *

"Q. I am going to rephrase it. Maybe I will just state your answer. When you said there was no price list given to you at the time of signing, you meant during the period you were editing the contract and signing it?

"A. When I was in the bird house with Felix editing the contract, yes.

"Q. At some other time during the day you got the contract?

"A. Yes.

"Q. Rather you got the price list either from Felix or someone else, and you don't remember who that was?

"A. I don't remember who it was."

As indicated by her testimony, Herron could recall reviewing the consignment agreement on July 13 and making several revisions in the form of deletions. The pertinent portions of the revised agreement provide that the Zoo agreed to be one of Eboigbe's sales agents; that the Zoo would assume all risk of loss for damage or destruction; and that the Zoo would keep the goods insured at the "full wholesale list price against damage, destruction, and loss of every kind" and would cause Eboigbe to be the "beneficiary of such insurance together with [the Zoo], as both parties respective interests appear." Furthermore, the Zoo agreed to deposit the insurance policies with Eboigbe.

The price list that Eboigbe claimed to have presented along with the consignment agreement describes the twentieth item as: *"FULANI MOTHER AND CHILD*—Walnut—9'6"—$350,000.00.*" In her deposition testimony, Herron acknowledged that she knew this was the price that Eboigbe wanted the sculpture insured at, and she conceded that there was no provision in the consignment agreement that limited the amount of the required insurance to the work's value as opposed to Eboigbe's price. Asked, however, whether the contract called for the works to be insured at their price, as opposed to their actual value, Herron replied, "That is determined by the insurance company." Pressed for an answer whether the consignment agreement required that the works be insured at their value or at their price, she answered, "I am not an insurance man." She did state, though, that she was aware of no provision in the consignment agreement which allowed the Zoo to reduce the insurance to the object's value if it was less than the price, and that she never told Eboigbe during the time she was editing the consignment agreement that the amount of the insurance would be less than the object's price.

Guy DeDiemar, a marketer/underwriter for Schiff, Kriedler–Shell insurance company, the Zoo's insurance agent, testified that he was contacted by Herron on July 13 and was advised by her that the Zoo wished to obtain some additional insurance under its existing policy with Cincinnati Insurance Company to cover Eboigbe's artwork. Upon his request, Herron faxed him Eboigbe's price list. DeDiemar testified that he discussed appraisals of the artifacts with Herron and the fact that there was no time for any appraisals to be done. DeDiemar testified that he was nonetheless "satisfied" with Eboigbe's price list because, according to him, works of art scheduled under any fine arts coverage are given a maximum value only, meaning that the insurance company could price the art after any loss. He testified that he orally notified the Zoo that he had obtained an endorsement to its main policy with the Cincinnati Insurance Company. The written endorsement, however, was not prepared until eleven days after *Fulani Mother and Child* was damaged. The endorsement states in part:

"Loss settlement. Unless otherwise stated in this policy, the value of the property insured is not agreed upon but shall be determined at the time of loss or damage.

"We will not pay more than the least of the following amounts:

"(a) the actual cash value of the property at the time of loss or damage;

"(b) the amount for which the property could reasonably be expected to be repaired to its condition immediately prior to loss or damage;

"(c) the amount for which the article could reasonably be expected to be replaced with one substantially identical to the article lost or damaged; or

"(d) the applicable amount of insurance."

According to DeDiemar, the insurance company "definitely" never agreed upon a value of $350,000 for the statue *Fulani Mother and Child.*

As noted, *Fulani Mother and Child* was damaged prior to the opening of the exhibit. Apparently the sculpture had been placed behind metal stanchions with thick roping, as were all Eboigbe's works. According to Herron's testimony, Eboigbe had dictated where the sculptures should be in relation to each other and the front and back of the exhibit. Exactly what caused the sculpture to fall was never discovered, and neither the Zoo nor Eboigbe posited a theory on the exact circumstances which led to the decapitation of the carved female figure Fulani Mother.

At trial, Eboigbe testified that he began work on the sculpture *Fulani Mother and Child* in 1976, and that it took between nine months and a year to complete. In 1982 he priced the piece at $65,000; in 1984 he priced it at $75,000; in 1987 he priced it at $120,000; in 1988 he priced it at $350,000. Explaining why he raised the price in 1988 to $350,000, Eboigbe testified at trial:

"A. My thinking is that that piece, Fulani Mother and Child, Ida Iyesige and Oba mean a whole lot to me especially Fulani. Those pieces I cannot duplicate. That's not something that Felix can just go to the studio and whip up. That's why I raise the price up. It's not something that, it's a piece that's going to speak out for me, if I'm gone, if we all are gone. That piece going to be valuable. Millions and millions of people will be debating it. It's a masterpiece. It not a piece you find everywhere in the world."

Eboigbe testified that *Fulani Mother and Child* had been exhibited in the lobby of the conference room at the United Nations Plaza in New York. Furthermore, evidence was adduced at trial that articles featuring Eboigbe in such magazines as *Jet* often included pictures of the sculpture. As described by Eboigbe, *Fulani Mother and Child* was his "ambassador" piece.

According to Eboigbe, he had previously sold one of his sculptures to Bill Cosby, the television actor, for $18,000, and another major sale of a piece was to a physician for $27,500. He testified that he had never sold one of his sculptures for more than that figure. He testified somewhat obdurately that he had never had his artwork separately appraised and insured by himself. Asked whether he had ever had an offer to buy *Fulani Mother and Child,* Eboigbe said that he could not recollect any. Furthermore, in testimony which is difficult to understand either because of Eboigbe's accent or because of a problem in the transcription of the record certified to this court, Eboigbe appears to have indicated that his pricing of the sculpture *Fulani Mother and Child* was dependent, in whole or in part, on the amount of insurance galleries were able to obtain for it when shown. Defense counsel also sought to elicit from Eboigbe whether he knew what the term "wholesale price list" meant, but he did not respond directly.

Asked by the court whether the price list meant to him that he would sell *Fulani Mother and Child* for $350,000, Eboigbe replied, "No sir, less." Asked what he would have done if he had received an offer of $150,000 for the piece, Eboigbe stated:

"A. I probably say it would take me a little while but I probably say okay on it because I know it with them and they are to spread my name all over and I can borrow it and use it for shows."

Eboigbe further testified that he "might" have sold the piece to a gallery for $140,000 if the gallery allowed him to borrow it back.

Gilbert Young, a conservator, testified to his familiarity with Eboigbe's sculpture techniques and expressed his opinion that the sculpture could be restored. Young estimated the cost of restoration at between $4,000 and $8,000. He stated that the damage was "major," however, and further opined that although the repair would not be visible to the layman's eye, the restored sculpture would suffer a ninety percent loss in value. Young further testified that he had operated a gallery and appraised art. He was then asked:

"Q. Do you know the difference between the term retail versus wholesale?

"A. Yes, I do.

"Q. What does wholesale mean to you?

"A. It means the dealer's cost or what he would get for the product.

"Q. What's retail?

"A. Retail is what you would pay as a consumer outside those two entities."

Willis H. ("Bing") Davis, Chairman of the Fine Arts Department at Central State University, testified to his credentials as an artist and as a scholar and

collector of African art. He testified that he would rate Eboigbe as "one of the more important living African American artists." He was asked as follows:

"Q. Based upon your education, training and experience in the field of art and specifically in the field of African art, do you have an opinion as to the value of the *Fulani Mother and Child* sculpture before it was broken?

"A. I would place the value that the artist had placed it at, $350,000.

"Q. What is it about the piece—if you like, if you need to use this to explain it, what is it about the piece that led you to this conclusion?

"A. Well, I always thought it was one of the most significant pieces of his body of work, because to me, an authority in the area of teaching African art, it transcends the old and new. It's a pivotal piece. I still see remnants of traditional training and pieces that also have very contemporary designs of existence. You feel like it could have lived today and made today. In terms of what I knew and have seen about traditional carving, particularly coming out of that particular area of the continent, it was a bridging piece we call a pivotal to the circle. You can see that old but you can still feel the new. It was a very important, very impressive piece of work."

Davis testified that, as a result of the damage to it, the sculpture presently had no value, even if restored.

Upon cross-examination, Davis conceded that while aware of Eboigbe's sales of artwork, he had "never really known how much he would have received for any of the pieces that I know he has sold." He stated further that he was unaware that no person had ever offered Eboigbe money for *Fulani Mother and Child.*

Howard Storm, holder of a master of fine arts degree, formerly chairman of the arts department at Northern Kentucky University with specific responsibility for the major sculpture program, and the director of the school's Monumental Sculpture Program, testified that the essential criterion for determining "market value" with respect to a particular piece of work by an artist was the artist's record of sales. He testified that if a piece of art is properly restored its market value is "not hindered." He stated that he had examined *Fulani Mother and Child* and determined that its market value in 1989 was $36,000. Asked to explain his basis for this estimate, he stated:

"A. Consideration of the material, the size of the piece, the quality of the work of the piece, consideration of the artist's previous market value, which I was familiar with based on the show at the Loft Gallery.[3] And based on my understanding of his career relative to the whole art world and where he was in

---

3. Storm testified that he was formerly the Director of the Loft Gallery when Eboigbe had exhibited his work there.

it, I felt that $36,000 was a very, based on that, those considerations, was a very fair evaluation.

"Q. In your professional opinion, based on your education, training, and experience, were you aware in 1989 of any living artist that did this type of work that could command six figures for his art?

"A. No." (Footnote added.)

Storm was further asked to describe the difference between retail and whole-sale price. He replied:

"A. In the art world all galleries charge different amounts and you may show a piece one place where they may only take ten or 20 percent. Another may take 80 or 90. If you are connected with a big gallery they take 90 to 95 percent of the total value of the piece and give the artist a small stipend or salary to keep them going. But generally most of the time galleries take about 50 percent so the artist gets half the retail price."

According to Storm, the sculpture *Fulani Mother and Child*, properly re-stored, would suffer only a twenty percent reduction in value. With respect to the prices Eboigbe had given the sculpture, Storm stated that it was not uncommon for an artist to state a price and yet be willing to take considerably less for the piece while hoping that someone would pay the asking price. Elsewhere in his testimony he referred to a list of the artist's asking prices as his "wish list."

On cross-examination, Storm conceded that his recollection of the price of the statue *Fulani Mother and Child* at the Loft Gallery in 1981 was between $10,000 and $20,000, whereas in the exhibit book for that particular show it was actually listed at $95,000. He further conceded that a piece far superior in quality to the artist's lesser, more typical work could command a substantial multiple over the price of the lesser pieces. Moreover, Storm admitted that he did not hold himself out as an expert in African art.

## II

■ In its first assignment of error, the Zoo asserts that the trial court erred by denying its Civ.R. 41(B)(2) motion, which it made at the close of Eboigbe's case and renewed after it rested its own case, because Eboigbe's witnesses failed to provide probative evidence of market value for the sculpture *Fulani Mother and Child*. Specifically, the Zoo assails the sufficiency of the evidence to establish that *Fulani Mother and Child* had any market value whatsoever, *i.e.*, that there was any demand for it in the marketplace. Further, the Zoo challenges the bases upon which Eboigbe and his witnesses formulated their opinions on the statue's worth, stating that they were predicated on a lack of

knowledge, catalogues not in evidence,[4] emotion, the availability of insurance, and other considerations too subjective to be probative of value.

Regarding the first part of the Zoo's argument, while it is true that the evidence establishes that Eboigbe had not received an offer to buy *Fulani Mother and Child,* there was substantial evidence that there was a market for Eboigbe's artwork. Smaller pieces had commanded prices of $18,000 and $27,-000. The fact that no one had yet sought to purchase the artist's recognized masterwork does not mean that it lacked currency in the art market. As to the second part of the Zoo's argument, the fair market value of *Fulani Mother and Child* presented a question of fact for the trial judge, and he was free to consider insurance figures, Eboigbe's asking and selling prices, sales of lesser pieces by Eboigbe, Eboigbe's reputation in the art world, expert opinion as to the relative importance of *Fulani Mother and Child* both as an example of Eboigbe's work and as an example of contemporary African art by one using traditional methods, and any other evidence relative to the sculpture's value. See *Davis v. Rowe* (May 20, 1992), N.D.Ill., No. 91 C 2254, unreported, at 5, 1992 WL 112237.

In sum, we find no error in the trial court's overruling of the Zoo's Civ.R. 41(B)(2) motion based upon the arguments set forth in the Zoo's first assignment of error.

### III

In its second assignment of error, the Zoo asserts that the trial court erred by finding on the basis of Eboigbe's motion for partial summary judgment that it was an "art dealer" as defined by R.C. 1339.71(A).

Before we examine the merits of this assignment, it is important to set forth the manner in which the trial court ultimately decided this case. In addition to a claim for intentional infliction of emotional distress, which was later disposed of on summary judgment in the Zoo's favor, to recover for the damage done to *Fulani Mother and Child* Eboigbe's complaint asserted claims sounding in contract, negligence, and strict liability. The contract claim was predicated upon an allegation that the Zoo had contractually agreed to insure the sculpture for $350,000, and that its failure to do so constituted a breach for which it was liable for the full amount. The negligence claim was predicated upon the allegation that the Zoo's negligence in caring for and maintaining the sculpture while in its

---

4. The Zoo contends that Davis based his testimony, in whole or in part, on Sotheby art catalogues which were not introduced into evidence, thus violating Evid.R. 703. This is simply not the case. A review of the transcript does not give any indication that Davis based his opinion on the catalogues. Shown them at trial, he stated only that they served to confirm that a market existed for African art. He did not state that he used the catalogues to arrive at his opinion of the value of *Fulani Mother and Child.*

possession was the proximate cause of the damage done to it. The strict liability claim was predicated upon the allegation that the Zoo was an "art dealer" for purposes of the strict liability imposed under R.C. 1339.72(D).

As noted previously, R.C. 1339.72(D) is part of a statutory section dealing with consignment of art works to dealers. This section requires that art dealers, when they take works on consignment, enter into a contract with the artist which must have in it "[t]he value of the work of art * * *." See R.C. 1339.75. The art dealer is then strictly liable for the value of the work of art established in the written contract in case of loss or damage. See R.C. 1339.72. If, however, the art dealer violates the statutory scheme by not including in the contract of consignment a value for the work of art, R.C. 1339.78 provides that the artist is entitled to his "actual damages" plus reasonable attorney fees.

The trial judge held on the basis of Eboigbe's motion for partial summary judgment that the Zoo was an "art dealer" under the statute. At the beginning of trial, the Zoo took the position in its opening statement that it was liable for the damage done to *Fulani Mother and Child*, but only to the extent of its fair market value, which it was the purpose of the trial to determine. Upon the close of evidence and arguments of the parties, the trial judge stated from the bench that he found that the contract between Eboigbe and the Zoo, consisting of the consignment agreement and the price list, did not comply with R.C. 1339.78 because it did not establish a value for *Fulani Mother and Child*. According to the trial judge, from the testimony adduced it was clear that the price of $350,000 which appeared on the list was not the statue's value but, rather, simply an asking price. From this determination the trial judge proceeded to R.C. 1339.78 to determine Eboigbe's "actual damages," which he considered synonymous with loss of market value. The trial judge determined that the market value of *Fulani Mother and Child* in 1989, prior to its decapitation, was $120,000. The trial judge then deducted the Zoo's commission fee of twenty-five percent, arriving at a figure, $90,000, representing the value of the undamaged work of art to Eboigbe had he sold it for market value through a commissioned sale. Next, the trial judge further reduced the value of the damage award by $18,000, based upon a finding that, upon restoration, twenty percent of the statue's value could be salvaged. Finally, the trial judge added $6,000 to the judgment for the cost of restoration. The total amount of the damage award was, resultantly, $78,000. In addition, pursuant to the statutory grant of reasonable attorney fees to the artist, the trial judge awarded Eboigbe attorney fees in the amount of $52,000.

Thus, although the trial judge applied the statute concerning the consignment of artworks to dealers, he did not hold the Zoo to any higher measure of damages under the statute than Eboigbe's actual damages. In other words, the trial judge, though proceeding under the statute, ultimately applied the very same

measure of damages advocated by the Zoo, being the fair market value of the sculpture. As noted, the Zoo did not contest its liability for the damage to the work, and therefore the statute's imposition of strict liability was superfluous. The Zoo was arguably prejudiced by the trial judge's resort to the statute, however, since the award of $52,000 in attorney fees was made pursuant to R.C. 1339.78. Given this potential prejudice, we now turn to the propriety of the grant of partial summary judgment to Eboigbe on the issue of whether the Zoo was an "art dealer" under R.C. 1339.71(A).

R.C. 1339.71(A) defines an "art dealer" as "a person engaged in the business of selling works of art, other than a person exclusively engaged in the business of selling goods at public auction." The parties have not cited to us, and we have not found upon our own research, any cases expounding on this definition or otherwise shedding light on its intended breadth.

In his motion for partial summary judgment, Eboigbe argued that the Zoo was an "art dealer" on the simple logic that since the Zoo admittedly sold works of art, it was, *ipso facto*, engaged in the business of doing so. Among the materials Eboigbe presented in support of his motion was the Zoo's admission that on or about July 14, 1989, it exhibited and held out for sale works of art, including pieces by Eboigbe, as well as an excerpt from the deposition of Nora Kelly, director of resource development at the Zoo, in which she stated that artwork is one of many major categories of items offered at "Zoofari," the Zoo's annual auction to raise money. Furthermore, in his reply brief to the Zoo's motion in opposition, Eboigbe submitted a copy of the Zoo's monthly newsletter, *Zoo News*, in which is advertised an art show hosted by the "Zoo's Andrew Erkenbrecher Society" with the notation that "[a]ll pieces displayed will be for sale with 20 percent of the sales benefiting the Zoo." In addition, the newsletter advertises a "Panda Print" on sale at the Zoo Gift Shop.

In its memoranda in opposition to Eboigbe's motion, the Zoo presented its articles of incorporation and two affidavits. The articles of incorporation, which date from 1932, state in part:

"Said corporation is organized for the purpose of constructing and maintaining a museum for the preservation and exhibition of living and dead animals and other works of nature, and a museum of natural history, and of giving instruction in connection therewith; and of maintaining a park in which such animals may be housed, kept and cared for, and wherein musical concerts and other lawful entertainments may be given, refreshment and recreation provided, and sports had; and to encourage forestry; and to promote interest in, and the conservation and preservation of, the flora and fauna of the surrounding region."

In the first affidavit, Nora Kelly stated that the Zoo's exhibition and auction[5] of art was for the purpose of fundraising, and that the Zoo did not engage in the "business" of selling art such as would an art dealer. In the second affidavit, Howard Storm stated that it was his professional opinion that the Zoo was an "exhibitor" and not an "art dealer" as defined by statute. According to Storm, the fact that the Zoo conducts public auctions and exhibits art that can be purchased does not make it an "art dealer." Storm stated, "I have dealt with art dealers for many years, and I am familiar with the standards, protocols and business practices of art dealers, and I am familiar with the practices of [the Zoo], and it is my professional opinion that [the Zoo] is not an art dealer."

The trial court, in granting Eboigbe's motion for partial summary judgment on the issue of whether the Zoo was an "art dealer" under the statute, did not articulate a basis for its conclusion.

We hold that the issue of whether the Zoo is an "art dealer" was not amenable to summary judgment upon the materials submitted by the parties. Obviously by requiring that the person be "engaged in the business" of selling art the legislature intended not everyone who sells art to be an "art dealer." Rather, the term "engaged in the business" would seem to connote a certain level of commercial activity and professional status. As a matter of first impression, we do not interpret R.C. 1339.71 to mean, as a matter of law, that a zoological institution which periodically exhibits and offers art to raise funds to further its primary mission of operating a zoo necessarily becomes engaged "in the business" of selling art such as to constitute it an "art dealer" under the statute. Rather, to make such a determination requires fuller development of the evidence with respect to the size and nature of the role that the exhibition and sale of art plays in the broad penumbra of the Zoo's operations. In sum, granting as we must all inferences in favor of the Zoo as the nonmoving party under Civ.R. 56, we hold that there remained genuine issues of material fact regarding the extent to which the Zoo's sale of art constituted an actual business of the Zoo as opposed to an adjunctive fundraising activity.

We conclude, therefore, that the Zoo's second assignment of error is well taken and thus invalidate the trial court's grant of summary judgment on the Zoo's status as an art dealer.

---

5. It is unclear from the materials whether the Zoo's auction of art at its annual dinner auction "Zoofari" was open to the public. As noted, R.C. 1339.71(A) specifically excepts from the definition of an "art dealer" one who publicly auctions art. Although Eboigbe's works were exhibited at a separate event, the factual question of whether the Zoo's auction of art was public would be material to determine the larger issue of whether the Zoo engages in the business of selling art.

## IV

In his first assignment of error in his cross-appeal, Eboigbe asserts that the trial court erred in ruling that the consignment contract, including the price list, did not establish a value for *Fulani Mother and Child* in compliance with R.C. 1339.72. Given our resolution of the Zoo's second assignment of error, this question has become entirely prospective in nature since the trial court may or may not determine on remand that the case falls under the statute. Hence, under App.R. 12(A)(1)(c), we do not reach the merits of this assignment.

In his second assignment of error, Eboigbe asserts that the trial court erred by failing to find for him on his contract claim against the Zoo. As Eboigbe acknowledges in his brief, the trial court's decision essentially ignored this claim. He argues now on appeal that "the manifest weight of the evidence" showed that the Zoo had contracted to insure the goods for $350,000, without a loss-settlement-clause limitation, and that the Zoo's failure to do so constituted a breach for which the Zoo is liable to Eboigbe for the full amount.

■ We agree that the trial court's failure to address the contract claim was error, as it represented an alternative theory of recovery of potentially a higher amount than the sculpture's fair market value. However, despite Eboigbe's arguments to the contrary, a determination of this claim depends upon the resolution of several material questions of fact concerning the intent of the parties. It is uniquely the province of the trial court to weigh the evidence and make such findings. We cannot, as an appellate court, review against the weight of the evidence factual findings which were not made, weigh the evidence and make our own factual findings, or determine, absent such factual findings below, whether Eboigbe was entitled to judgment on his contract claim. The error he assigns, therefore, that the trial court mistakenly failed to find for him on his contract claim, cannot be validated on this record.

In his final assignment of error, Eboigbe asserts that the trial court erred by deducting from his recovery the Zoo's twenty-five percent commission. In essence, Eboigbe asks that we construe, as a matter of first impression, the meaning of "actual damages" under R.C. 1339.78. Again, however, it is unclear, given our resolution of the Zoo's second assignment of error, whether this case will be decided on remand under the statute, and therefore the assignment of error is entirely prospective. Thus, under App.R. 12(A)(1)(c), the merits of this assignment are not reached.

Accordingly, in Appeal No. C–930021 the judgment below is reversed and this case is remanded to the trial court for further proceedings. In Appeal No. C–930043, the trial court's judgment is affirmed.

*Judgment accordingly.*

KLUSMEIER, P.J., SHANNON and GORMAN, JJ., concur.

APPENDIX A